UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) ) ) ) ) ) ) ) ) ) ) ) | NO. 3:23-md-03071<br>MDL No. 3071<br><br>THIS DOCUMENT RELATES TO:<br>   3:23-cv-00326<br>   3:23-cv-00378<br>   3:23-cv-00391<br>   3:23-cv-00445<br>   3:23-cv-00742<br>   3:23-cv-00979<br>   3:23-cv-00757<br>   3:23-cv-00792 |

**MEMORANDUM OPINION**

Thoma Bravo Fund XIII, L.P., Thomas Bravo Fund XIV, L.P., and Thoma Bravo, L.P. (the "Thoma Bravo Defendants") filed Motions to Dismiss the Multifamily Plaintiffs' Second Amended Complaint (Doc. No. 570) and the Student Plaintiffs' First Amended Complaint (Doc. No. 572). The Multifamily and Student Plaintiffs responded jointly (Doc. No. 614), and the Thoma Bravo Defendants filed a Reply (Doc. No. 642). The motions are now ripe for review. For the reasons that follow, the Court will deny the Thoma Bravo Defendants' Motions.

**BACKGROUND**

The following allegations are taken from Multifamily Plaintiffs' Second Amended Complaint ("Multifamily Complaint") (Doc. No. 530) and Student Plaintiffs' First Amended Complaint ("Student Complaint") (Doc. No. 527) and are considered to be true to resolve the pending motion.[1]

---

[1] Throughout this Opinion, references to "Plaintiffs" pertain to both the Student and Multifamily Plaintiffs.

1

RealPage, Inc. ("RealPage") developed an "integrated technology platform that provides software solutions for the multifamily [and student] housing markets," which enables horizontal competitors who rent multifamily and student housing "to coordinate and agree upon rental housing pricing and supply." (Doc. No. 530 ¶ 2; see also Doc. No. 527 ¶ 5). RealPage rolled out its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Doc. No. 530 ¶ 209). In 2009, RealPage started YieldStar Student Housing ("YieldStar Student"). (Doc. No. 527 ¶ 40). From 2002 to early 2016, YieldStar operated as a rent advisory service. (Doc. No. 530 ¶ 212). In early 2016, RealPage transitioned YieldStar to become a "rent-setting software." (Id. ¶ 212). RealPage then acquired Lease Rent Options ("LRO") from Rainmaker Group in 2017. (Id. ¶ 26). It integrated LRO and YieldStar into a "unified platform." (Id. ¶ 221). In 2020, RealPage launched AI Revenue Management ("AIRM"), a "combination of its legacy revenue management platforms [YieldStar and LRO] and a super-charged price optimization and revenue management tool." (Id. ¶ 221). Today RealPage operates a full suite of revenue management services, which includes RealPage Revenue Management ("RPRM"), RealPage Student Revenue Management ("Student RPRM"), and Student Lease Rent Options ("Student LRO") (collectively with YieldStar, YieldStar Student, LRO, and AIRM, the "Revenue Management Solutions" or "RMS"). (Id. ¶ 2; Doc. No. 527 ¶ 4).

RealPage's clients include owners of residential properties ("Owners"), companies that serve as both owners and operators of residential properties ("Owner-Operators"), and property management companies ("Managers"), including large property managers and lessors of student housing ("Lessors"). (Doc. No. 530 ¶ 3; Doc. No. 527 ¶ 3). These companies are horizontal competitors. (Doc. No. 530 ¶ 6; Doc. No. 527 ¶ 230). As of December 2020, RealPage "had over

31,700 clients, including each of the 10 largest multifamily property management companies in the United States." (Doc. No. 527 ¶ 21; see also Doc. No. 530 ¶ 61).

Multifamily and Student Plaintiffs allege that RealPage and its clients have formed an illegal price-fixing cartel. (See Doc. No. 530 ¶ 6; Doc. No. 527 ¶¶ 118, 156). It begins when RealPage touts its ability to help clients obtain the optimal price for multifamily and student housing units regardless of market forces. RealPage's clients each separately contract with RealPage, paying RealPage periodic fees and, critically, providing RealPage their independent commercially sensitive pricing and supply data. (Doc. No. 530 ¶¶ 5, 13; Doc. No. 527 ¶ 9). Then, on an annual basis, RealPage's clients re-affirm their commitment when they "renew their software licensing" agreements. (Doc. No. 530 ¶ 276. See also Doc. No. 527 ¶ 93 (stating that RealPage's software is "typically licensed over one year terms")). RealPage applies its revenue management algorithm to this data pool of competitor information to determine optimal rent prices for each of RealPage's clients, which is then available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Doc. No. 530 ¶ 4; Doc. No. 527 ¶ 9). To be sure, not all RealPage clients utilize RealPage's entire RMS suite; for example, some multifamily clients use only LRO while others have used YieldStar, LRO, and AIRM. (See, e.g., Doc. No. 530 ¶¶ 70, 85, 88, 124). Likewise, while Student Plaintiffs allege most student housing clients use only YieldStar Student, they allege that at least Greystar uses other student housing RMS through RealPage in addition to YieldStar Student. (Doc. No. 527 ¶¶ 56, 58-60). But regardless of which services a client subscribes to, by "no later than 2020, . . . all RealPage RMS were combined into a single unified database." (Doc. No. 530 ¶ 222; see also Doc. No. 527 ¶ 63 ("RealPage offers a product that creates one unified platform . . .")).

By using the RMS, RealPage's clients are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment." (Doc. No. 530 ¶ 11; Doc. No. 527 ¶ 9). They do this by collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations. (Doc. No. 530 ¶ 11, 15; Doc. No. 527 ¶ 6). Clients with multifamily properties also artificially control the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (Doc. No. 530 ¶ 31), and staggering lease renewals to "minimize naturally occurring periods of oversupply," (id. ¶ 36). This collective behavior, driven by RealPage's pricing recommendations, has resulted in "parallel pricing that cannot be explained by typical economic factors" among the multifamily housing Owners, Owner-Operators, and Managers who use RealPage's RMS. (Id. ¶ 22). Additionally, between March 2015 and March 2023, "increased usage of RealPage's RMS corresponds with increasing [multifamily] rents over th[e] same period." (Doc. No. 530 ¶ 21). As for student housing, a regression analysis conducted on student housing in four cities of properties using RealPage RMS "estimated an average overcharge of 10.9% on properties that were priced using YieldStar Student . . ." (Doc. No. 527 ¶ 141).

RealPage was a public company from 2010 to 2020. (Doc. No. 530 ¶ 61). In December 2020, investment funds of Thoma Bravo L.P., Thoma Bravo Fund XIII L.P. and Thoma Bravo XIV L.P, (collectively, "Thoma Bravo"), acquired RealPage for $10.2 billion in a transaction that made RealPage a privately-owned company. (Id.). "Thoma Bravo had been closely following RealPage's growth as a company since RealPage went public in 2010." (Id. ¶ 62). Following the acquisition, Thoma Bravo appointed its Operating Partner, Charles Goodman, as the Chairman of RealPage's board of directors. (Id. ¶ 66). Thoma Bravo also screened and recommended two new

RealPage corporate suite employees, both of whom had formerly worked for Thoma Bravo owned entities. (Id.). Dana Jones became RealPage's new Chief Executive Officer ("CEO") and Vinit Doshi became RealPage's Chief Operating Officer ("COO"). (Id.).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016). However, the Court will "disregard bare legal conclusions and naked assertions" and "afford[] the presumption of truth only to genuine factual allegations." Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)) (internal quotations omitted). Nor can the Court "credit a threadbare recital of the elements of a cause of action ... supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678)) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## DISCUSSION

To state a plausible claim under Section 1 of the Sherman Act, a plaintiff must allege three elements: 1) the existence of a contract, combination, or conspiracy among two or more separate entities that 2) unreasonably restrains trade and 3) affects interstate or foreign commerce. See Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment, 48

F.4th 656, 663 (6th Cir. 2022). A plaintiff must specifically allege each defendant's participation in the conspiracy. Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713, 723 (W.D. Tenn. 2022). "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." A conspiracy cannot exist solely between a parent and its wholly owned subsidiary because they have "a complete unity of interest." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984). A parent corporation may, however, be accountable for Sherman Act violations of its subsidiary if it participated in the conspiracy beyond "mere ownership." Jones, 618 F. Supp. 3d at 722-23, 725.

As an initial matter, the Court addresses the specific Thoma Bravo entities that Plaintiffs have sued—Thoma Bravo L.P., Thoma Bravo Fund XIII L.P., and Thoma Bravo XIV L.P. The Thoma Bravo Defendants claim that "RealPage was in fact acquired by Mirasol Parent, LLC and Mirasol Merger Sub, Inc., affiliates of Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P., investment funds which are themselves affiliates of Thoma Bravo." (See Doc. No. 571 at 1 n.2; Doc. No. 573 at 1 n.3). This assertion is relegated to a footnote in the Thoma Bravo Defendants' briefs, and they do not otherwise argue that Plaintiffs have named the wrong Thoma Bravo entities. (Id.). The Thoma Bravo Defendants' failure to argue that Plaintiffs have named the wrong entities constitutes a waiver of that argument. Moat v. Metropolitan Government of Nashville, 2023 WL 4035909, at *12 n.9 (M.D. Tenn. Jun. 15, 2023) ("The court typically will not consider arguments asserted only in footnotes, and such arguments are often deemed to be waived."). [2] See also United States v. Johnson, 440 F.3d 832, 846 (6th Cir. 2006) ("it is a settled

---

[2] In Moat, the court ultimately did exercise its discretion to consider the arguments from a footnote because "the plaintiff's Response addresses the defendant's footnoted arguments, and the defendant addresses them again in its Reply (albeit partially, again, in footnotes). The court finds the footnoted arguments to be sufficiently briefed." 2023 WL 4035909, at *12 n.9.

appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quoting United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996)).

Regardless, the relevant inquiry in an antitrust case is not which entity owns the alleged conspirator, but which entity's independent action joined and contributed to the conspiracy. See Cupp v. Alberto-Culver USA, Inc., 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) ("If Plaintiff named SBC only because of its corporate relationship to BSG, that relationship, without more, is insufficient to implicate SBC in any allegedly unlawful actions of the other Defendants."). As explained below, Plaintiffs allege that the Thoma Bravo entities, not the Mirasol entities, conducted due diligence, selected a new RealPage Chief Executive Officer ("CEO") and Chief Operations Officer ("COO"), and made a Thoma Bravo Managing Partner the Chairman of RealPage's Board of Directors. Therefore, the named Thoma Bravo entities, not the Mirasol entities, are the correct defendants.

Turning to the arguments actually made, the Thoma Bravo Defendants argue that Plaintiffs have not alleged any participation in the alleged conspiracy aside from Thoma Bravo's ownership of RealPage. (Doc. No. 571 at 1-2; Doc. No. 573 at 1-2). They further argue that Thoma Bravo cannot be held liable for RealPage's conduct because parent corporations are not liable for the acts of their subsidiaries. (Doc. No. 571 at 9; Doc. No. 573 at 9). Thus, because Plaintiffs have not pleaded any direct involvement by the Thoma Bravo Defendants, the claims against them should be dismissed. (Doc. No. 571 at 12; Doc. No. 573 at 12). In response, Plaintiffs argue that they have sufficiently pleaded Thoma Bravo's involvement in the alleged conspiracy, (Doc. No. 614 at 3), and that under the "single enterprise" framework, "if a plaintiff's allegations of anticompetitive

7

conduct (read holistically) are well-pled as to a single economic entity, then each constituent piece of that entity that participated in the anticompetitive conduct can be included as a defendant," (id.).

The Motions and Response raise two questions: 1) whether Plaintiffs have adequately pleaded the Thoma Bravo Defendants' involvement in the alleged conspiracy, and 2) whether the Thoma Bravo Defendants may be held accountable for the conduct of their subsidiary even if they were not directly involved in the conspiracy. Because the Court finds that Plaintiffs have adequately alleged Thoma Bravo's involvement, the Court need not reach the second question.[3]

## I.      Allegations Specific to The Thoma Bravo Defendants

The Multifamily and Student Complaints make the following allegations specific to the Thoma Bravo Defendants: Thoma Bravo acquired RealPage in April 2021 for 10.2 billion dollars. (Doc. No. 530 ¶ 61; Doc. No. 527 ¶ 22). Thoma Bravo conducted due diligence prior to the acquisition, which gave it access to RealPage's data and the ability to "identify the sources of RealPage's growth." (Doc. No. 530 ¶ 64). Thoma Bravo also knew prior to acquiring RealPage that RealPage's founder and Chief Executive Officer, Steve Winn, "was preparing to step back from the day-to-day control of RealPage . . . and Thoma Bravo acquired RealPage aware that Thoma Bravo would be hiring a new leadership team." (Id. ¶ 63). Thoma Bravo's Founder and Managing Partner, Orlando Bravo, was quoted in a press release disclosing the transaction:

> As a firm, we embrace these fundamental shifts in industries where software driven solutions are making meaningful advancements and we have the expertise and resources to help grow these capabilities at companies like RealPage. We believe our partnership can accelerate RealPage's momentum as it innovates on behalf of its customers.

---

[3] The Court does, however, discuss Plaintiffs' argument concerning "single entity" liability pursuant to Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752 (1984), in its Memorandum Opinion addressing TREV's Motion to Dismiss. TREV's Motion to Dismiss is Doc. No. 576, and Student Plaintiffs' Response, which raises similar arguments to those raised at pages 5–7 of Plaintiffs' Response to the Thoma Bravo Defendants' Motions, is Doc. No. 615.

8

(Doc. No. 530 ¶ 65; Doc. No. 527 ¶ 23).  Steve Winn, RealPage's exiting Chief Executive Officer, stated:

> Thoma Bravo brings significant expertise from its deep experience with software companies, and together we are committed to helping our customers innovate, grow and serve the next generation of multifamily operators and residents.

(Doc. No. 530 ¶ 65; Doc. No. 527 ¶ 23).

After acquiring RealPage, Thoma Bravo selected a new CEO and COO for RealPage, both of whom were known to Thoma Bravo because they were previously employed by a Thoma Bravo subsidiary, Sparta Systems.  (Doc. No. 530 ¶ 66; Doc. No. 527 ¶ 24).  Additionally, Thoma Bravo's Operating Partner, Charles Goodman, became the Chairman of RealPage's Board of Directors.  (Doc. No. 530 ¶ 66; Doc. No. 527 ¶ 24).  Since the acquisition, Thoma Bravo has aided RealPage in completing four acquisitions of smaller companies and has also helped RealPage adopt new policies to "drive . . . operational efficiencies."  (Doc. No. 530 ¶ 66 and n.76; Doc. No. 527 ¶ 24).  Plaintiffs further allege that "On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done." (Doc. No. 530 ¶ 62; Doc. No. 527 ¶ 22).

**II.     Discussion**

Plaintiffs' allegations specific to the Thoma Bravo Defendants are sufficient to support their claims against those Defendants at this early stage of the case.  The Court acknowledges that "price fixing conspiracy[ies] would be expected to leave little publicly available evidence of [their] existence . . . [and] [i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information."  In

9

re Broiler Chicken Antitrust Litigation, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017).  See also In re Lantus Direct Purchaser Antitrust Litigation, 2021 WL 8016913, at *5 (D. Mass Jun. 11, 2021) (delaying resolution of "the question whether the plaintiffs may pursue claims against Sanofi P.R. under a single economic enterprise theory . . . following further development of the relevant facts.").

Considering Plaintiffs' lack of access to the inner workings of RealPage and the relationship between RealPage and Thoma Bravo, Plaintiffs have adequately alleged that Thoma Bravo is involved in the operation and control of RealPage today.  Indeed, Thoma Bravo selected the new CEO and COO and made one of its Managing Partners the Chairman of RealPage's Board.  While "[a] sole seat on the Board of Directors does not mean that . . . [Thoma Bravo] directed [RealPage] to take every action," Jones, 618 F. Supp. 3d at 724, Plaintiffs do not allege a "sole seat."  Instead, they allege that Thoma Bravo has infiltrated RealPage's corporate suite in addition to putting itself in charge of the company's Board.  This, combined with the $10.2 billion price Thoma Bravo paid for RealPage, certainly entitles Plaintiffs to an inference that Thoma Bravo is aware of and exercises some degree of control over the operation of RealPage's revenue management software.  (See Doc. No. 530 ¶ 61; Doc. No. 527 ¶ 21).  To further credit this inference, Plaintiffs allege RMS is a significant product among RealPage's offerings.  Specifically, at the end of 2022, four million of the approximately 19.7 million total units for which RealPage provides software used RMS, meaning more than twenty percent of the total units using any RealPage product are specifically using the software at issue in this case. (Doc. No. 530 ¶ 224).  Moreover, RealPage is the "primary price-setting vendor to the multifamily housing rental software market." (Id. ¶ 213).

It is true that Plaintiffs have not alleged any communications or agreements between Thoma Bravo and any of RealPage's RMS clients. But they need not do so. After all, it is Plaintiffs' theory that RealPage is the common denominator between otherwise horizontal competitors that allows them to "coordinate and agree upon rental housing pricing and supply." (Doc. No. 530 ¶ 2. See also Doc. No. 527 ¶ 4 ("The Lessor Defendants used RealPage's RMS to stop making independent pricing and supply decisions.")). Thoma Bravo's contribution to the conspiracy, as alleged by Plaintiffs, is its influence and control over RealPage's operations, including its RMS. Courts have found such action to be sufficient to allege a role in the conspiracy. See Jones, 618 F. Supp. 713, 722 (W.D. Tenn. 2022); In re Outpatient Medical Center Employee Antitrust Litigation, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022); In re Capacitors Antitrust Litigation, 106 F. Supp. 3d 1051, 1069 (N.D. Cal. 2015).

The Court also acknowledges that, as alleged, significant events in support of the conspiracy—the 2016 transition of RealPage's RMS from price-recommending to price-setting (Doc. No. 530 ¶ 212); the 2017 acquisition of LRO (Id. ¶ 26); and the 2020 launch of AIRM (Id. ¶ 221)—all occurred prior to Thoma Bravo's purchase of RealPage. But these allegations just lend more credence to Plaintiffs' allegation that "Thoma Bravo was aware of RealPage's anticompetitive activities" prior to the acquisition. (Doc. No. 530 ¶ 62; Doc. No. 527 ¶ 22). Furthermore, the Multifamily and Student Complaints allege an ongoing conspiracy and one of their requested remedies is an injunction, (see Doc. No. 530 at 297 (Prayer for Relief C); Doc. No. 527 at 107 (Prayer for Relief D–E)), so it is clear that Plaintiffs' claims include conduct after Thoma Bravo's acquisition of RealPage.

The Court finds Thoma Bravo's position virtually indistinguishable from Bain Capital's position in Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713 (W.D. Tenn. 2022). In that case,

11

the plaintiffs alleged that Varsity Brands, LLC, an organization that produces cheerleading competitions, and its parent companies engaged in anticompetitive conduct in violation of the Sherman Act. Id. at 717-18. Bain Capital, a private equity firm, acquired Varsity Brands, LLC in 2018. Id. at 718. Bain, which was also named in the lawsuit, sought dismissal because "Plaintiffs insufficiently allege[d] conduct specifically engaged in by . . . Bain that violates the antitrust laws." Id. at 719. The Court denied Bain's motion, finding the plaintiffs' allegations that "Bain provid[ed] funding for Varsity to acquire rivals, s[at] on the Board of Directors, and maintain[ed] control of USASF and other rule making bodies while in its position of power" were sufficient to state a claim against Bain. Id. at 724. Thoma Bravo argues that here, unlike Jones, Plaintiffs have not alleged "any strategic acquisition which has any nexus to the allege price-fixing conspiracy." (Doc. No. 642 at 4). They need not do so, particularly because their claims concern a conspiracy to fixes prices and not monopolization. Cf. Jones, 618 F. Supp. 2d at 717 (bringing both Sherman Act Section 1 and Section 2 claims). Instead, like the plaintiffs in Jones, Plaintiffs have alleged enough facts concerning Thoma Bravo's control of RealPage for the Court to infer that Thoma Bravo has independently acted in furtherance of the conspiracy.

     Discovery may not bear the fruit that Plaintiffs expect it to yield. If that is the case, the Thoma Bravo Defendants are free to renew their motion at summary judgment. See Jones, 618 F. Supp. 3d at 725 ("Discovery may elucidate further facts as to Bain['s] . . . direct participation in the scheme, which will be required at later litigation phases. But, for now, Plaintiffs allege sufficient facts for the Court to plausibly conclude that these Defendants independently participated in the enterprise . . ."). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that recovery is very remote and unlikely." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). Here, Plaintiffs have

met the threshold of "sufficient factual matter to render the legal claim plausible." Cabinets to Go, LLC, 605 F. Supp. 3d at 1057 (M.D. Tenn. 2022) (internal quotation marks omitted).

An appropriate order will be entered.

                                                _____
                                                WAVERLY D. CRENSHAW, JR.
                                                CHIEF UNITED STATES DISTRICT JUDGE