UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) NO. 3:23-md-03071 <br> ) MDL No. 3071 <br> ) <br> ) THIS DOCUMENT RELATES TO: <br> )          ALL CASES |

## MEMORANDUM OPINION

Bell Partners, Inc., Brookfield Properties Multifamily LLC, CONAM Management Corporation, ECI Group, Inc., Equity Residential, Independence Realty Trust, Inc., Mid-America Apartment Communities, Inc., Mid-America Apartments, L.P., Morgan Properties Management Company, LLC, The Related Companies, L.P., Related Management Company, L.P., Security Properties Residential LLC, Simpson Property Group, LLC, Thrive Communities Management, LLC, Windsor Property Management Company, WinnCompanies LLC, and WinnResidential Manager Corp. (collectively the "LRO Defendants")[1] filed a Motion to Dismiss the Multifamily Plaintiffs' Second Amended Complaint (Doc. No. 580) and Memorandum in Support (Doc. No. 582) on October 9, 2023. Multifamily Plaintiffs responded (Doc. No. 621), and the LRO Defendants filed a Reply (Doc. No. 635). The motion is ripe for review. For the reasons that follow, the Court will deny the motion.

---

[1] The LRO Defendants are Owner-Operators and Managers who used one of RealPage's revenue management services, Lease Rent Options ("LRO"), during the relevant period. (Doc. No. 530 ¶¶ 77, 85, 94, 109, 112, 130, 145, 151, 160, 172, 178, 181, 188, 190). The Motion is not joined by all Defendants alleged to have used LRO. (See Doc. No. 530 ¶¶ 70, 121, 124, 154, 166). Furthermore, several of the sixteen LRO Defendants bringing this motion are also alleged to have use RealPage's YieldStar or AIRM in addition to LRO. (See id. ¶¶ 77, 94, 112, 130, 145, 151, 172).

1

## BACKGROUND

The following allegations are taken from Multifamily Plaintiffs' Second Amended Complaint ("Multifamily Complaint") (Doc. No. 530) and are considered to be true to resolve the pending motion.

RealPage, Inc. ("RealPage") developed an "integrated technology platform that provides software solutions for the multifamily housing market." (Doc. No. 530 ¶ 2). RealPage rolled out its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Id. ¶ 209). From 2002 to early 2016, YieldStar operated as a rent advisory service. (Id. ¶ 212). In early 2016, RealPage transitioned YieldStar to become a "rent-setting software." (Id.). RealPage then acquired Lease Rent Options ("LRO") from Rainmaker Group in 2017. (Id. ¶ 26). It integrated LRO and YieldStar into a "unified platform." (Id. ¶ 221). In 2020, RealPage launched AI Revenue Management ("AIRM"), a "combination of its legacy revenue management platforms [YieldStar and LRO] and a super-charged price optimization and revenue management tool." (Id. ¶ 221). Today, RealPage operates this full suite of revenue management services, which also includes RealPage Revenue Management ("RPRM") (collectively the "Revenue Management Solutions" or "RMS"). (Id. ¶ 2).

RealPage's clients include owners of residential properties ("Owners"), companies that serve as both owners and operators of residential properties ("Owner-Operators"), and property management companies ("Managers"). (Id. ¶ 3). These companies are horizontal competitors. (Id. ¶ 6). As of December 2020, RealPage "had over 31,700 clients, including owner operators and each of the 10 largest multifamily property management companies in the United States." (Id. ¶ 61 (internal quotations omitted)).

Multifamily Plaintiffs allege that RealPage and its clients have formed an illegal price-fixing cartel. (Id. ¶ 6). It begins when RealPage touts its ability to help clients obtain the optimal price for multifamily housing units regardless of market forces. RealPage's clients, including the Owner, Owner-Operator, and Manager Defendants, each separately contract with RealPage, paying RealPage periodic fees and, critically, providing RealPage their independent commercially sensitive pricing data. (Id. ¶¶ 5, 13). RealPage then applies its revenue management algorithm to this data pool of competitor information to determine optimal rent prices for each of RealPage clients, which is then available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Id. ¶ 4). Not all RealPage clients utilize RealPage's entire RMS suite; for example, some use only LRO while others have used YieldStar, LRO, and AIRM. (See, e.g., id. ¶¶ 70, 85, 88, 124). But regardless of which services a client subscribes to, by "no later than 2020, . . . all RealPage RMS were combined into a single unified database." (Id. ¶ 222).

By using the RMS, RealPage's clients are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment." (Id. ¶ 11). They do this by (1) collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations, (Id. ¶¶ 11, 15); (2) controlling the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (id. ¶ 31); and (3) staggering lease renewals to "minimize naturally occurring periods of oversupply." (Id. ¶ 36). This collective behavior, driven by RealPage's pricing recommendations, has resulted in "parallel pricing that cannot be explained by typical economic factors" among the Owners, Owner-Operators, and Managers who use RealPage's RMS. (Id. ¶ 22). Additionally, between March 2015 and March 2023, "increased

3

usage of RealPage's RMS correspond[ed] with increasing rents over th[e] same period." (Id. ¶ 21).

## LEGAL STANDARD

The Parties recognize, as they must, that to survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016). However, the Court will "disregard bare legal conclusions and naked assertions" and "afford[] the presumption of truth only to genuine factual allegations." Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)) (internal quotations omitted). Nor can the Court "credit a threadbare recital of the elements of a cause of action . . . supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678)) (internal quotations omitted). The "factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., 605 F. Supp. 3d 1051, 1057 (M.D. Tenn. 2022) (quoting Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)), *reconsideration denied sub nom*. No. 3:21-CV-00711, 2023 WL 5013055 (M.D. Tenn. Aug. 7, 2023). "Ultimately, only a complaint that states a plausible claim for relief survives a motion to dismiss." Dakota Girls, 17 F.4th at 648 (quoting Iqbal, 556 U.S. at 679)) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or

inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## ANALYSIS

To state a plausible claim under Section 1 of the Sherman Act, a plaintiff must allege three elements: 1) the existence of a contract, combination, or conspiracy among two or more separate entities that 2) unreasonably restrains trade and 3) affects interstate or foreign commerce. See Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment, 48 F.4th 656, 663 (6th Cir. 2022). The LRO Defendants' Motion attacks only the first element. They argue that a necessary ingredient to the alleged conspiracy is RealPage's use of its clients' non-public, proprietary commercial information to make pricing decisions. (Doc. No. 582 at 7-8; Doc. No. 635 at 4-5). They further argue that, contrary to this central conspiracy feature, Multifamily Plaintiffs' earlier-filed complaints alleged that LRO uses only public data to make its pricing recommendations, (Doc. No. 582 at 3-4), and Multifamily Complaint does not specifically allege that after acquiring LRO, RealPage began to use non-public information as part of LRO's algorithm, (id. at 6; Doc. No. 635 at 4-5). Because Multifamily Plaintiffs have not alleged a central feature of the conspiracy as to LRO, the LRO Defendants argue that dismissal of the Section 1 Sherman Act claims, as they relate to LRO, is required. (Doc. No. 582 at 7-8).

Multifamily Plaintiffs oppose the motion because the LRO Defendants misconstrue the allegations from their earlier-filed complaints, including their reliance upon a ProPublica article, "Rent Going Up? One Company's Algorithm Could Be Why." (Doc. No. 621 at 8-9. See also Doc. No. 530 ¶ 1 n.1). Multifamily Plaintiffs contend that those statements do not contradict their conspiracy claims. (Doc. No. 621 at 8-9). They further argue that the Multifamily Complaint supersedes their earlier-filed pleadings, and at most, the earlier statements are possible evidentiary

admissions that should not be used against them to resolve the motion to dismiss phase of the case. (Id. at 9-11).

There are at least three reasons why the LRO Defendants' motion must be denied:

### 1. The Multifamily Complaint Adequately Alleges That the "Enhanced" LRO Uses Private Data

The Multifamily Complaint adequately alleges that RealPage's "enhanced" LRO uses private data after acquiring it from Rainmaker Group. Specific to LRO, the Multifamily Complaint alleges: (1) in 2017, RealPage acquired LRO from Rainmaker Group, (Doc. No. 530 ¶ 26); (2) after the acquisition, RealPage "enhance[d]" LRO and "integrated both YieldStar and LRO," (id. ¶ 28); and (3) by no later than 2020, YieldStar and LRO "were combined into a single unified database . . . on the RealPage side at the software and data levels," (id. ¶¶ 222-23). By converting the data inputs from both LRO and YieldStar into "single unified database," (id. ¶ 222), RealPage comingled public data from LRO and non-public data from YieldStar—or Plaintiffs are at least entitled to this inference from their allegations.

In their Reply, the LRO Defendants rely heavily on the recent District of Nevada decision, Gibson v. MGM Resorts International, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). (See generally Doc. No. 635). While the allegations in that case, on their face, appear analogous to this case, the devil is in the details. There, the court found that "it is unclear whether the pricing recommendations generated to Hotel Operators include [competitors'] confidential information fed in; perhaps they only get their own confidential information back, mixed with public information from other sources." Id. at *5. Here, the Multifamily Complaint clearly alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and provides price recommendations based on that private competitor data. For example, Multifamily Plaintiffs allege:

> RealPage also tells its RMS clients exactly whose non-public data is being used for pricing decisions. For each client, including Owners, Owner-Operators, and Managing Defendants, RealPage maintains a "peer list" of that client's peers whose transaction data will be used as an input in RealPage's algorithm for that client's pricing. Peer lists explicitly state that the competitors listed will be used "to determine the magnitude of a change in rent . . . ." Clients, including Defendants, are able to review and comment on their peer list, and they can even request that specific competitors are included on the list. RealPage then quickly pushes the non-public, daily, real-time data from those competitors' properties into an algorithm to influence RealPage's pricing decisions. In this way, each Owner Defendant, Owner-Operator, and Managing Defendant consciously commits to using non-public data from its direct horizontal competitors to price its own units.

(Doc. No. 530 ¶ 289). As the Gibson court acknowledged, "a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm." Gibson, 2023 WL 7025996, at *4. That is what Multifamily Plaintiffs have alleged here.

The Multifamily Complaint alleges that RealPage clients using LRO contribute to the price-fixing conspiracy by being "informed that their data may be included in pooled data sets and that they likewise may be provided with their regional competitors' pooled data." (Id. ¶ 290). The LRO Defendants argue that this allegation "bar[s] any inference of conspiracy" because the Plaintiffs concede that client data is aggregated and not specifically identifiable to the client. (Doc. No. 635 at 5). Their argument is a hyperbole because Multifamily Plaintiffs do not concede that information shared by RealPage with its clients is not specifically identifiable. In fact, they allege the opposite. (Doc. No. 530 ¶ 12 ("Witness interviews confirm that through RealPage's RMS platform, the user was in fact able to ascertain the identity of competitors that were using RealPage's RMS based on the address of the properties that were listed as comparables on the RMS platform."); see also id. 245-46 (same)).

Even if the Defendant clients of RealPage only had access to aggregate data, the crux of Multifamily Plaintiffs' claims is that RealPage compiles the Defendants' private data and then uses

7

its algorithm against that private data to recommend multifamily unit prices to the Defendants. It is irrelevant then in what form the Defendants monitor their competitors' data—they still *use* that private data through their reliance on RealPage's pricing algorithm.

The two cases the LRO Defendants rely upon in their Reply do not help their argument. In In re Citric Acid Litigation, the court held that receipt of aggregated data in trade association reports, without more, did not establish that a defendant, Cargill, was participating in a price-fixing scheme. 191 F.3d 1090, 1098-99 (9th Cir. 1999). That opinion was written at the summary judgement phase of the case, and the plaintiffs did not offer any other evidence of Cargill's participation. Id. Furthermore, the trade association compiled data from sellers of citric acid worldwide and aggregated the data at the *country* level when it disseminated it to organization members. Id. Nor did the trade association make any price recommendations to its members, not to mention recommendations based on more granularly-focused data. See id. at 1098.

Similarly, the defendant, ShareBuilder, in In re Local TV Advertising Antitrust Litigation distributed aggregate data to its broadcast company clients. 2022 WL 3716202, at *4 (N.D. Ill. Aug. 29, 2022). This aggregate data included both local and national data in addition to each client's individual data. Id. at *2. True, ShareBuilder did sometimes make pricing recommendations to its clients "on an ad hoc basis." Id. at *8. But unlike Multifamily Plaintiffs' allegations here, the Local TV Advertising plaintiffs only alleged that ShareBuilder acted as "a conduit of information exchange between and among [broadcast companies]." Id. at *4. In this case, Multifamily Plaintiffs allege that the Defendants use RealPage far more than a simple conduit of information—they delegate their multifamily apartment pricing to RealPage with the knowledge that RealPage makes its recommendations by relying upon their competitors' private data. (See, e.g., Doc. No. 530 ¶ 289).

8

Multifamily Plaintiffs further allege that one RealPage LRO client, AvalonBay,[2] was so concerned about "information sharing and price setting" that it "insisted on a contractual provision . . . that prohibited [RealPage] from: (1) utilizing any data in the LRO solution provided to AvalonBay other than AvalonBay's own data and publicly available data; and (2) utilizing AvalonBay's data or disclosing the LRO recommendations made to AvalonBay to any other [RealPage] client." (Id. ¶ 219).[3]  The LRO Defendants do not address this allegation in their Memorandum or Reply.

Multifamily Plaintiffs' allegations satisfy the pleading standard at this phase of the case. Discovery may reveal that following RealPage's acquisition, LRO continued to make pricing recommendations based only on publicly available data, and the LRO Defendants are free to renew their arguments at summary judgment.  But the Court will not prematurely dismiss Multifamily Plaintiffs' claims as they relate to LRO, especially because "price fixing conspiracy[ies] would be expected to leave little publicly available evidence of [their] existence . . . [and] [i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information." In re Broiler Chicken Antitrust Litigation, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017).

---

[2] AvalonBay is not a defendant in this case.
[3] The AvalonBay Master Services Agreement ("MSA") was entered into between AvalonBay and Rainmaker on March 27, 2017, one month after the RealPage acquisition of Rainmaker was announced but before the transaction closed. (Doc. No. 530 ¶ 219).  In 2022, RealPage signed an amendment to the LRO MSA that extended the provisions concerning the use of AvalonBay's proprietary data and the inputs used for AvalonBay's pricing recommendations.  (Id. ¶ 219 n.114). The amendment also named RealPage as Rainmaker's successor in interest to the MSA.  (Id.).

### 2. Multifamily Plaintiffs' Earlier Filed Complaint Does Not Contradict the Operative Complaint

Multifamily Plaintiffs' allegations about RealPage's enhancements to LRO *after* acquiring it are not inconsistent with the allegations in prior complaints that *before* LRO was acquired by RealPage, its creator used only public data to develop LRO's pricing algorithm. (Doc. No. 582 at 3-4). Nor do these allegations contradict the statements the LRO Defendants quote from a ProPublica article cited in the Multifamily Complaint. (See id. at 4; Doc. No. 530 ¶ 1 n.1). That article simply states:

> Donald Davidoff, the primary developer of rival software called Lease Rent Options, or LRO, said he designed his program differently [from RealPage's YieldStar], to head off any concerns about collusion. Instead of relying on a digital warehouse that includes competitor data, Davidoff used a complex formula and public market data to steer LRO's algorithm.

Heather Vogell, Rent Going Up? One Company's Algorithm Could Be Why, ProPublica, Oct. 15, 2022.[4] Both the prior allegations and the current allegations in the operative complaint can be true. When it was created and sold by the Rainmaker Group, LRO could have been limited to public data. Then, after being acquired by RealPage, RealPage could have altered the program to rely upon both public and private data. That is exactly what Multifamily Plaintiffs have alleged happened, as described above.

The cases the LRO Defendants cite are inapposite. In each of those cases, the Court found that the earlier-filed pleadings contradicted the later-filed pleadings. In Pennsylvania Railroad Company v. City of Girard, a city sued a railroad company for damages resulting from the city's clean-up of ashes and debris emitted from the railroad onto a city street. 210 F.2d 437, 438 (6th Cir. 1954). A key issue in the case concerned whether an underpass beneath a section of the

---

[4] This article is available at https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent.

railroad tracks was owned by the railroad or had been dedicated for public use. Id. The court determined that the initial cross-petition filed by the railroad admitted that the underpass had been dedicated for public use. Id. at 440. The railroad later filed a superseding cross petition that omitted this admission, but the court determined the earlier-filed statement to be an admission against interest because it contradicted the railroad's later argument that it owned the underpass. Id.

Likewise, in PetroJebla, SA de C.V. v. Betron Enterprises, Inc., the defendants made arguments that directly contradicted their earlier pleadings. The defendants' original answer admitted that "Betron L.P. Gas Inc. ["BLPG"] does not exist." 2020 WL 95802, at *4 (E.D. Mich. Jan. 8, 2020). This statement was supported by the plaintiff's report to the court showing that BLPG existed but was dissolved in 2002. Id. Nonetheless, the defendants later argued that BLPG did exist and as a result, the court should not pierce the corporate veil and find the individual defendant liable for BLPG's alleged conduct. Id. The court considered both the defendants' prior admission and the report of dissolution provided by the plaintiffs in deciding to pierce the corporate veil. Id. Unlike the scenarios in Pennsylvania Railroad Company and PetroJebla, no contradiction exists here. Thus, the LRO Defendants' argument for dismissal falls apart.

### 3. Multifamily Plaintiffs' Earlier-Filed Statements Are Possible Evidentiary Admissions Not Appropriate for Judicial Notice

Even if the allegations in the prior complaint and ProPublica article contradicted Multifamily Plaintiffs' allegations in the Multifamily Complaint, the LRO Defendants' argument for dismissal at this stage would still fail. The allegations in the earlier-filed complaint are, at most, possible evidentiary admissions against interest and not statements for which the Court will take judicial notice. See Davis v. Echo Valley Condo. Ass'n, 349 F. Supp. 3d 645, 653 (E.D. Mich. 2018), aff'd, 945 F.3d 483 (6th Cir. 2019). "[B]ecause the case is now before the Court on

11

a Rule 12(b)(6) motion to dismiss, the Court will not resolve—solely on the pleadings and without arguments from the Parties—whether [the Multifamily Plaintiffs'] statements made in prior pleadings amount to admissions against interest." Am. Nat. Prop. & Cas. Co. v. Campbell Ins., Inc., No. 3:08-0604, 2010 WL 1754358, at *2 (M.D. Tenn. Apr. 30, 2010), order set aside due to settlement, No. 3:08-CV-00604, 2011 WL 6259473 (M.D. Tenn. Oct. 14, 2011).

In short, the Multifamily Plaintiffs and LRO Defendants appear to agree on one thing—that the use of non-public proprietary data is a component of the alleged price fixing conspiracy. (See Doc. No. 530 ¶ 13; Doc. No. 582 at 7; Doc. No. 621 at 4-5). Multifamily Plaintiffs have sufficiently alleged that the LRO service offered by RealPage both collected this non-public data from LRO clients and used this non-public data in LRO's algorithm. The Court will not dismiss the claims as they relate to LRO from the Multifamily Complaint.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE